**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **JOHN DOE D.P.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 16-2267-DDC** |
| **UNITED STATES OF AMERICA AND MARK WISNER,** | |
| **Defendants.** | |

## MEMORANDUM OF DECISION UNDER RULE 52(a)

Over the course of a week in late September and early October of 2020, the court conducted a bench trial via Zoom video technology with the active parties in this case, plaintiff John Doe D.P. and defendant United States of America. Both parties consented to conducting the trial in this fashion, given the global pandemic affecting our country and the courts. Defendant Mark Wisner—who is an inmate in a Kansas correctional facility—did not participate in the trial, although his deposition was taken to preserve testimony for trial.

Post-trial, the court allowed the parties to submit optional briefing and proposed findings of fact. The court has reviewed the evidence from trial—including the evidence submitted for review outside the virtual courtroom. At the conclusion of the parties' presentation of evidence, several evidentiary questions remained for the court's decision. To the extent necessary to resolve the case, the court makes the requisite determinations about relevance and admissibility in this Memorandum of Decision. If this Memorandum of Decision does not refer to contested evidence or its admissibility, the court found the evidence immaterial to its ruling and decided that no ruling was necessary.

At a very high level, this case involves allegations of repeated, improper touching of plaintiff's genitals during medical appointments with defendant Mark Wisner at the Veterans Administration Medical Center in Leavenworth, Kansas.  Plaintiff seeks to hold the United States responsible for Wisner's actions, on theories of medical malpractice and intentional infliction of emotional distress.  The United States doesn't dispute plaintiff's allegation that Wisner examined plaintiff's genitals when unnecessary, without gloves.  Instead, the disputes here focus on:

> (1) whether the United States can be held liable at all for Wisner's actions because
>
> > (a) the acts allegedly were not within the scope of his employment, and
> >
> > (b) the acts allegedly were not taken "in furnishing medical care"; and, if the United States is liable for Wisner's conduct,
>
> (2) whether Wisner caused plaintiff any—or, at most, minimal—injury.

Finally, the parties sharply disagree about the amount of a damage award—if plaintiff prevails.

As required by Fed. R. Civ. P. 52(a)(1), this Memorandum of Decision includes separate findings of fact and conclusions of law.  "A district court's findings of fact 'should be sufficient to indicate the factual basis for the court's general conclusion as to ultimate facts[,] . . . should indicate the legal standards against which the evidence was measured[,] . . . [and] should be broad enough to cover all material issues.'"  *OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1203 (10th Cir. 2007) (quoting *Otero v. Mesa Cty. Valley Sch. Dist.*, 568 F.2d 1312, 1316 (10th Cir. 1977); further citations omitted).  But "Rule 52(a) does not require the district court to set out its findings and conclusions in excruciating detail."  *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 902 (10th Cir. 2013) (Martinez, J., dissenting) (citation omitted).  On the other hand, "too little detail frustrates meaningful appellate review by requiring the parties and this court to guess at

why the district court reached its conclusion." *OCI Wyo., L.P.*, 479 F.3d at 1204 (citation omitted).

With these standards in mind, the court now turns to its Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Plaintiff saw Wisner for medical appointments at least four times between August 21, 2013 and November 13, 2013. Plaintiff also testified that he saw Wisner in 2014 for shoulder pain, but plaintiff did not know the date and Wisner did not memorialize an appointment with plaintiff during 2014. During at least three appointments (two appointments in October and one in November 2013), Wisner performed a genital examination of plaintiff.[1] He never wore gloves during any of those exams. None of the genital examinations were medically justified.[2]

2. During the exams, Wisner made unnecessary and inappropriate sexual comments about plaintiff's penis. He commented, for example, "I'm sure the ladies must like this," and asked about plaintiff's sexual practices and experiences while he was overseas.

---

[1]　It is unclear whether Wisner performed a genital examination on August 21, 2013. Plaintiff testified that Wisner examined his genitals at every appointment, but plaintiff still would have been housed in the "DOM"—a term that serves as shorthand for the VA's "domiciliary" program, a housing program for veterans with mental health issues, addiction issues, and homelessness—during this appointment. Plaintiff also testified that Wisner did not perform genital exams while plaintiff was in the DOM. Plaintiff showed difficulty remembering precise dates and appointments. Wisner complicated the task of identifying when he saw plaintiff by omitting some appointments and actions from his records, likely as part of an effort to avoid detection. The court finds the difference in being sexually molested three, four, or even five times largely immaterial to deciding the issues here. And plaintiff's unprecise memory is hardly a surprise because, during this era, he was moving through life in a drug-induced haze. Plaintiff also testified that Wisner performed a rectal exam at the November 13, 2013 appointment, and this exam is reflected in Wisner's notes. The court finds plaintiff's testimony about this November exam credible and, quite clearly, a heart-wrenching experience for plaintiff. Defendant's arguments suggesting the rectal exam did not occur because plaintiff did not mention it to Special Agent Kerry Baker or in his deposition are not persuasive.

[2]　In the other two Wisner-based cases tried before this one, the court heard testimony about the length of the genital examinations—specifically, that they were longer than medically acceptable (which is between 30 seconds to one minute). In this case, plaintiff did not discuss how long the exams lasted. Dr. Kelley testified that plaintiff made it clear to him that none of the genital exams lasted longer than a minute.

3. Wisner also used unconventional disrobing practices with plaintiff.  He would have plaintiff lie on his back, and then Wisner would unfasten plaintiff's belt and pants, pull them down, and slide his hand underneath plaintiff's boxer shorts to conduct the genital examination.

4. While plaintiff felt uncomfortable during some of his visits with Wisner, he did not realize, immediately, that Wisner was acting inappropriately and he did not stop seeing Wisner for appointments.

5. Before plaintiff began seeing Wisner for medical appointments, he suffered from wartime PTSD, generalized anxiety disorder, major depressive disorder, panic disorder without agoraphobia, and chronic shoulder pain (after three surgeries on his shoulder).[3]  Plaintiff also suffered from addiction to opiates and benzodiazepines.  He had felt suicidal off and on since 2009.  Indeed, at one point in July 2013, plaintiff believed that he had hit "rock bottom."  This sensation occurred before he even met Wisner.[4]  Wisner was aware of plaintiff's problems; indeed, he first met plaintiff while plaintiff was in the "DOM" program at the VA.[5]  Plaintiff was in the DOM from July 2013 to October 2013.  Despite

---

[3]   At trial, defendant offered Exhibits 443, 444, 445, and 446, which were statements made to support plaintiff's claims for VA disability in 2013 and were written by plaintiff's family members and a treating psychologist.  Defendant argued that the exhibits were probative of plaintiff's pre-existing conditions before he met Wisner.  The court initially ruled that the exhibits were inadmissible under Fed. R. Evid. 803(1), the "present sense impression" hearsay exception.  But then, defendant argued that the exhibits were instead admissible under Fed. R. Evid. 807, the residual exception to the rule against hearsay, because the statements are supported by sufficient guarantees of trustworthiness and they are more probative on the point for which they are offered than other evidence that defendant could acquire through reasonable means.  The court took defendant's offer on this theory under advisement and provided plaintiff an opportunity to file a responsive brief.  Plaintiff did not file one.  The court now concludes that Exhibits 443, 444, 445, and 446 qualify under Rule 807 and now admits them.  The court has considered them when evaluating plaintiff's mental and physical condition prior to meeting Wisner.

[4]   Defendant argues this testimony suggests that plaintiff's condition did not worsen after seeing Wisner.  But plaintiff's testimony on this subject continued and he clarified that, initially, he thought July 2013 was "rock bottom" but he now believes he did not hit rock bottom until later.

[5]   *See supra* note 1 and Findings of Fact ¶ 38 for further explanation of the DOM.

knowing that plaintiff suffered from addiction, Wisner prescribed opiates and benzodiazepines for plaintiff shortly after he was discharged from the DOM.[6]  Wisner was even on call one night when plaintiff went to the emergency room after taking too many benzodiazepines.  The next day, plaintiff met with Wisner, plaintiff's mother, VA social worker Dawn Clouse, and, possibly Dr. Santos—plaintiff's mental health provider.  Plaintiff's mother expressed her concern about medications the VA was prescribing for plaintiff, but Wisner told plaintiff's mother that plaintiff was not addicted to the medications and that he (Wisner) would take good care of plaintiff.  The opposite was true.  Plaintiff was addicted and was afraid that Wisner would not continue his prescriptions if he did not allow Wisner to examine his genitals at each appointment.  After Wisner stopped treating plaintiff, the VA started titrating plaintiff off the mediations.  But Wisner had convinced plaintiff that plaintiff's shoulder pain gave him a medically-valid reason for the opiate prescriptions, so when plaintiff's prescriptions were stopped, he turned back to street drugs[7] and, eventually, heroin to reduce his pain.

A.    **Findings About the Scope of Employment Question**

**The Work Which the VA Hired the Employee to Perform**

6.    Wisner was hired by the Department of Veterans Affairs ("VA") in 2008 as a Physician Assistant ("PA").

---

[6]    In a pretrial motion in limine, defendant asked the court to exclude evidence of Wisner's prescribing practices because plaintiff failed to exhaust administrative procedures for a claim for negligent prescription. As the court ruled before trial began, this evidence is probative of plaintiff's relationship with Wisner and why he might continue to engage in medical care despite Wisner's improper touching.  It also is probative of the freedom Wisner had in providing medical care, which is a factor used to determine whether Wisner was acting within the scope of his employment.  (*See* p. 28 of this Memorandum of Decision.)  Finally, there was much trial testimony about plaintiff's addictions.  It is fair for plaintiff to use Wisner's prescription practices to explain some of the reason for his addictions and provide broader context.

[7]    Although the precise timing is unclear, plaintiff used street drugs and exhibited drug-seeking behavior by obtaining multiple prescriptions from multiple physicians before July 2013.

7. A PA administers basic medical care and screenings.  These duties include genital, rectal, and prostate examinations when medically indicated.  These exams may involve sensitive, intimate, or uncomfortable matters.

8. As a primary care provider, Wisner compiled the personal history of patients.  In this role, sometimes providers must ask questions about sensitive and private matters, like sexual history, practices, and habits.

9. In short, Wisner was hired to conduct genital examinations, among other duties.  He also was expected to ask personal questions that might make patients uncomfortable—all with the proper goal of compiling a comprehensive medical history.

### The Freedom Allowed the Employee in Performing His Job Responsibilities

10. Wisner led the OEF-OIF Clinic (Operation Enduring Freedom and Operation Iraqi Freedom) at the VA Medical Center in Leavenworth, Kansas.  In that role, he had a great deal of autonomy.  He was the only primary care practitioner at the clinic, and was responsible for nearly a thousand patients, although the VA had a 750-patient limit.

11. No supervisor or chaperone was required to be present during Wisner's examinations of male patients.

12. Daniel Cline, M.D. was Wisner's first-line supervisor.  Dr. Cline was unaware that he was supposed to review Wisner's charts, and he did not monitor Wisner's activities.[8]

---

[8]   Defendant repeatedly has challenged this evidence's admissibility—evidence about what Wisner's supervisors did or failed to do.  Defendant maintains that this evidence is not relevant because the court has dismissed plaintiff's claims for negligent supervision.  The court ruled before trial that evidence of this nature was relevant to the foreseeability of Wisner's conduct.  This ruling stands.  While it's also true that this evidence overtly supports a negligent supervision claim, the court already has granted summary judgment against that claim.  Still, the evidence about Dr. Cline's monitoring omission tends to make it more probable than not that the VA should have foreseen Wisner's misconduct, and therefore is legally responsible for it.  The court has considered evidence showing what Wisner's supervisors did and didn't do, and what various employees knew or didn't know, as evidence germane to the foreseeability question.

This omission violated VHA Directive 2004-029,[9] which required monitoring and evaluation of a PA's clinical activities.  No one at the VA told Dr. Cline about rules governing him as a supervising doctor or ensured that he monitored Wisner's clinical activities.

13. In determining Wisner's competency, Dr. Cline relied on what Wisner said he had done. He did not investigate complaints about Wisner.

14. VHA Directive 1063 required oversight, consultation, and assistance with patient care management, but the VA did not follow any of these requirements for Wisner.

15. VHA Directive 1063 gives PAs varying levels of autonomy based on their experience: "full," "limited," and "supervised."  Wisner had full autonomy; that is, he had "full leeway to do his job, make independent medical decisions, and decide what tests to order, and perform diagnoses."

16. Wisner thus enjoyed unfettered authority to decide when and how to conduct genital, rectal, and prostate exams.  The court finds that Wisner had substantial freedom—in retrospect, far too much freedom—when performing his job duties.

**The Incidental Acts Reasonably Expected by the Employer**

17. The VA Eastern Kansas Health Care System issued a Policy Memorandum on February 5, 2010, to identify and address suspected abuse (including sexual abuse) among the patient population.  On May 21, 2013, the VA Eastern Kansas Health Care System issued another Policy Memorandum addressing incidents of patient abuse.

18. The Leavenworth VA's policies recognize the potential for patient abuse.

---

[9]   The Veterans Health Administration ("VHA") issues national policies that govern patient care and treatment in VA medical facilities.  These policies are known as "VHA Directives."

19. Health care provider abuse is a known risk in the health care community.

20. Given the VA's acknowledgment of the risk of patient abuse by the health care community, the court finds the VA should have anticipated that acts of abuse could occur in an unmonitored situation—particularly when the PA's job, by its very nature, involved sensitive and intimate examinations and discussions.

**The Nature, Time, and Place of the Deviation**

21. Wisner conducted all of his examinations during working hours, in an examination room at the VA Medical Center in Leavenworth, Kansas.

22. When Wisner performed a genital exam, it consumed only a small fraction of the time he spent with the patient during a clinical visit.

23. Dr. Thomas Kelley, plaintiff's expert witness, credibly opined that Wisner's conduct was incidental to the genital exam, the physical exam, and his job at the VA.  Also, Dr. Kelley credibly opined that even if the genital exams of plaintiff were not medically indicated or necessary, they still could serve a medical purpose because a medically-trained professional can discover abnormalities during such an exam.

**The Time Consumed in the Deviation**

24. Wisner's genital exams of plaintiff each lasted less than one minute.

25. Wisner's inappropriate comments during the exam consumed no more than several seconds.

26. In the context of a longer office visit, the time used for an inappropriate, ungloved genital examination represented a small proportion of time.

**The Employee's Intent**

27. Wisner's conduct manifested mixed motives.  Wisner wanted to be thorough in his exams, but also had an inappropriate sexual curiosity.  As a health care provider, Wisner aimed to be thorough.  Dr. Kelley testified credibly about Wisner's mixed motives.  The court found his testimony well-supported and consistent with the record as a whole.  Specifically, Dr. Kelley's characterization of Wisner's motives is consistent with Wisner's background in the military.  It also comports with other facts showing that Wisner appeared to conduct full physical examinations on his patients; he did not wholly abandon his role as a health care provider during appointments.  And during Wisner's January 23, 2015 interview with Agent Baker, Wisner told Agent Baker that "his method was simply thoroughness in looking for any irregularities in their genitals."  (Ex. 406, at WIS00034987.)

28. The court makes its factual finding about mixed motives despite some of Wisner's other statements during his January 23, 2015 interview with Agent Baker.  In that interview, Wisner admitted that he had crossed the professional line and performed excessive genital exams.  He conceded that he knew what he was doing was wrong but he lacked self-control.  He also admitted he had conducted genital exams to satisfy his own curiosity.  Wisner confessed that he would have conducted genital exams for his own pleasure even when not medically indicated.

29. In that same interview, Wisner acknowledged that he chose victims who were attractive and of a similar body-type.  He also took steps to avoid getting caught.  These steps included falsifying medical records and failing to document some genital examinations he performed.

30. While this evidence underscores Wisner's motive to satisfy his own "sexual curiosity," it does not negate the existence of other motives unrelated to his sexual curiosity. In general terms, when one views Wisner's job duties across his patient base as a whole, conducting genital examinations was part of his job. It still was necessary to conduct such examinations in many instances, and they still served a valid medical purpose independent of Wisner's prurient interests.

31. Moreover, Wisner's answers were recorded by Agent Baker after his interview. They were not transcribed in a deposition or sworn under oath. And according to Agent Baker's descriptions of Wisner's responses, Wisner's answers responded to questions that appeared somewhat confrontational. While Wisner was not in custody when interviewed, Agent Baker's Memorandum of Interview uses many words suggesting he had pressed the issue when Wisner answered in a way that appeared less than truthful or until Wisner "admitted" one thing or another.[10] The court gives Wisner's "admissions" during this interview slightly less weight than it would had the court heard Wisner's testimony live or via a deposition with admissible answers to review.

32. All of these facts considered, the court finds that Wisner acted with mixed motives.

---

[10]  Examples of "admissions" included in the Memorandum of Interview include:

- "[Wisner] initially tried to rationalize the incident as a simple reaction but then admitted that what he did was wrong."

- "Wisner eventually admitted that he crossed the professional line and was excessive in his genital exams."

- "[Wisner] admitted that these exams were conducted to satisfy his own curiosity and that he ultimately hid behind his 'thoroughness' as an excuse to examine their genitals."

- "[Wisner] admitted that he knew that what he was doing to these patients was wrong and that he had no self-control."

(Ex. 406, at WIS00034986 – WIS00034987.)

**Additional Findings on General Foreseeability**

33. The VHA required its facilities to use a centralized and comprehensive policy on reporting and tracking allegations of sexual misconduct at VHA facilities (among other things). The Leavenworth VA wholly failed to comply with this directive. Its reporting system was decentralized and lacked any coherent plan for tracking patient complaints. The VA should have foreseen that this omission could produce serious problems if a VA employee took advantage of his position in interactions with patients. The following evidence demonstrates how the Leavenworth VA's so-called tracking "system" made Wisner's conduct both foreseeable and, in actual fact, foreseen by the VA (albeit not foreseen by supervisors in a position to remove Wisner from patient care).

   a. Patient Advocate Richard Lawrenz used a Patient Advocate Tracking System ("PATS") to record complaints he received about health care providers. But other VA Leavenworth employees used a "Report of Contact" form that they did not enter into the PATS system. In fact, the VA's social workers and medical providers lacked access to PATS.

   b. VA Social Worker Dawn Clouse received complaints about Wisner's physical exams. But she did not investigate any of the complaints she received. She did not know of any centralized tracking system at VA Leavenworth for reporting sexual assaults. Clouse told Agent Baker that while Wisner was at VA Leavenworth, "she did not believe that there was a formal process in place" for reporting patient complaints.

   c. <u>During 2011</u>: A patient ("R.D.") reported that Wisner failed to wash his hands when performing a physical examination. But Clouse never brought this

11

complaint to Rudy Klopfer's attention.  Klopfer was the Director and CEO of VA Eastern Kansas Health Care System and, in that role, he principally was responsible for ensuring that the PA supervising policies were implemented. (During part of the time relevant to this lawsuit, Klopfer shared this responsibility with others, including Dr. Anil Desai, Chief of Service).

d.  February 17, 2012:  Wisner's supervisors, Dr. Desai and Dr. Cline, knew that Wisner, at least twice, had performed knee injections without having privileges to perform those procedures.  In response, Dr. Desai merely recommended that Wisner not carry out any procedures he did not have privileges to perform.

e.  February 21, 2012:  Lawrenz received a report from a patient ("T.S.") who was "uncomfortable" with comments Wisner made during a medical visit.  The patient also reported that Wisner used a scope to perform a rectal exam.  Lawrenz issued a "heads up" to Drs. Cline and Desai.  He also coded the complaint as an allegation of "negligence/malpractice."  Although the patient reported feeling "violated," Lawrenz did not report the complaints to the VA police because the patient was not "graphic" when he described what had occurred.  But in seven and a half years, it was the only time Lawrenz coded a complaint in the PATS system as "allegations of negligence/malpractice."

f.  During 2012:  Another patient ("N.A.") complained about Wisner to Clouse.  The patient said that he felt uncomfortable with Wisner's genital exams and that Wisner acted inappropriately during his exams.  The patient demanded a new provider.

g. <u>March 29, 2012</u>:  Another patient ("J.D.") reported to VA police that Wisner had sexually assaulted him during a medical appointment.  Specifically, J.D. alleged that Wisner sexually assaulted him the day before his report in an exam room by putting his hand down his underwear in his groin area without warning the patient in advance.  J.D. was admitted to the VA acute psychiatry unit that same day, asserting he felt "homicidal" toward Wisner.

h. <u>April 2, 2013</u>:  Another patient ("J.E.") reported to the VA that he did not feel that Wisner had his best interests at heart.  According to the complaint, Wisner told J.E. that he could "put more pain medication up his rear end and it wouldn't do any good."  J.E. requested another provider.

i. <u>September 20, 2013</u>:  Another veteran reported to Lawrenz that he would like another provider because he would be more comfortable with someone other than Wisner.

34. Based on the fact that the VA had received these reports before plaintiff's last visit with Wisner on November 13, 2013,[11] the court finds Wisner's conduct toward plaintiff was foreseeable to the VA.  The VA certainly had all this information about Wisner's behavior while he was treating plaintiff; the problem was that various discrete silos within the VA organization housed the reports.  But the VA should have collected the reports and complaints in a centralized manner that would have brought Wisner's widespread actions to the attention of decision-makers in a far more effective and timely manner.  The VA violated its own policies by failing to implement a centralized reporting

---

[11]    Again, plaintiff reports seeing Wisner once in 2014 for his shoulder injury.  Because there is no evidence revealing when that appointment occurred during 2014, the court has not considered reports about Wisner's conduct after 2013.

mechanism, and this violation renders unpersuasive the VA's argument that Wisner's conduct was unforeseeable because the right people at the VA did not know about it.[12]

**B.      Whether Wisner's Actions Were Taken "In Furnishing Medical Care"**

35.   The findings in this section take up the issue whether Wisner's actions were taken "in furnishing medical care."  This phrase comes from 38 U.S.C. § 7316(f).  Wisner's job duties at the VA included conducting genital exams.  As noted earlier, every genital examination occurred within the context of a longer medical appointment.  The court concludes that Wisner acted with mixed motives.  Although none of Wisner's genital examinations of plaintiff were medically justified, Dr. Kelley testified that the genital exams still might serve a valid medical purpose.  And medical care—which Wisner was providing to plaintiff—does not necessarily forfeit its status as medical care because a provider failed to wear gloves, used improper disrobing techniques, or made inappropriate comments.

36.   On this issue, the court finds the testimony of defendant's expert, Jeffrey Nicholson, unpersuasive and unhelpful.[13]  Mr. Nicholson opined that Wisner stopped providing medical care when his intent changed from providing medical care to committing criminal activity.  The court finds Mr. Nicholson's theory unrealistic, illogical, and unsupported.  This on-again-off-again test—advanced by defendant here to define when a

---

[12]    The VA doesn't explicitly argue that Wisner's conduct was unforeseeable based on who knew about the complaints.  Instead, throughout this litigation, the VA has urged the court to take an overly narrow view of foreseeability—urging the court to consider, exclusively, the nature of the employment and the duties required by the position.  Respectfully, the correct analysis requires more than just reviewing the job title and duties assigned to the position.  The court's view is consistent with the Tenth Circuit's use of the "*O'Shea* factors," as identified and applied later in this Memorandum of Decision.  (*See* pp. 26–29 of this Memorandum of Decision)

[13]    For this trial, the court received the testimony given by Mr. Nicholson in the earlier trial of Aaron Leininger's case.  The parties stipulated to this procedure, and their agreement also preserved the objections made during testimony in that earlier trial.

medical provider is practicing medicine and when he is not—relies too heavily on subjective measurements of intent.  Mr. Nicholson admitted that his theory had not been peer-reviewed, and the court finds it unpersuasive.

37. The court thus rejects Mr. Nicholson's approach and finds that Wisner's acts, even when improper, were taken "in furnishing medical care."

## C.  Findings About Plaintiff's Medical Malpractice Claim

38. Plaintiff first saw Wisner either while he was in the process of applying for service-connected disability benefits or he had just received a service-connected disability rating of 70% for PTSD with major depression and anxiety.  Plaintiff also had a 10% disability rating for his shoulder injury.  At the time, plaintiff was in the domiciliary program—the DOM.  Five months after plaintiff was released from the DOM, he was hospitalized again.  That time, plaintiff was hospitalized for more than 21 days, so the VA increased his service-connected disability rating for PTSD to 100%.  This increase became permanent seven months later.

39. When plaintiff met Wisner, plaintiff was addicted to opiates and benzodiazepines, but he was able to discontinue use of opiates while in the DOM, at least temporarily.

40. Failing to wear gloves when conducting a genital exam deviates from the standard of care.

41. Wisner deviated from the standard of care at least three times, committing malpractice when he conducted genital exams of plaintiff without wearing gloves.

42. These deviations arose from the scope of Wisner's job duties.

43. Wisner also deviated from the standard of care when he performed unnecessary genital exams of plaintiff.  This occurred, at a minimum, on October 24, 2013, October 26, 2013,

and November 13, 2013.  All of these deviations arose from the scope of Wisner's job
duties.

44. Wisner's disrobing practices deviated from the standard of care as well.  As Dr. Kelley
testified, the standard of care requires certain disrobing practices because of the sensitive
nature of the exams and the patient's vulnerability when required to undress.

45. Finally, Wisner violated the standard of care with his inappropriate sexualized comments.
Although primary care practitioners must discuss sensitive information and, sometimes,
ask questions about a patient's sexual history, practices, and habits, the manner Wisner
used to comment about plaintiff's genitalia violated the standard of care.

46. Still, genital examinations can serve a valid medical purpose even if performed in a
fashion that deviates from the standard of care.  And certainly, some portions of the
medical care Wisner provided plaintiff pursued a valid medical purpose:  to provide
diagnostic care.

47. Wisner's deviations from the standard of care harmed plaintiff.

48. Wisner's deviations from the standard of care had long-term consequences for patients
like plaintiff.  Such deviations can produce distrust, anger, humiliation, shame,
embarrassment, and emotional distress.  These results are consistent with the injuries that
plaintiff credibly testified he has suffered since his encounters with Wisner.

49. The court does not find credible Mr. Nicholson's theory that the standard of care
evaporated based on Wisner's contemporaneous intent.  More specifically, the court does
not accredit Mr. Nicholson's view that the standard of care applied until the moment
Wisner's intent changed—*i.e.*, it essentially evaporated the moment when Wisner began

acting on sexual curiosity or derived sexual pleasure from his genital exams.  The court found this testimony unpersuasive, and not based on a sound, peer-reviewed theory.

50. The court also rejects Mr. Nicholson's theory that a criminal act cannot amount to medical malpractice.  As Dr. Kelley testified, breaching the standard of care and committing a criminal act may occur, or co-exist, in the same moment.  To say it another way, the same action simultaneously may violate both the standard of care and the criminal laws.  A tortfeasor's exposure to criminal liability does not foreclose a finding that the tortfeasor's wrongdoing also violated the professional standard of care.  On this point, the court found this testimony by Dr. Kelley logical and credible.

**D.     Damages**

51. The court finds that the preponderance of evidence established—and by a wide margin— that plaintiff sustained additional PTSD because of his encounters with Wisner.  To be sure, plaintiff suffered from PTSD and a myriad of other problems before he ever encountered Wisner.  But this medical history does not eliminate the additional damage plaintiff suffered because of Wisner's tortious acts.  In fact, it is the severity of plaintiff's pre-existing conditions that compounded the damage caused by Wisner.  In reaching this finding, the court finds the following testimony credible and significant:

   a.  Plaintiff experienced and described to Dr. Stephen Peterson—who completed a forensic psychiatric evaluation of plaintiff and testified as one of his expert witnesses at trial—shame-based dreams about Wisner and the VA.  These dreams revealed plaintiff's feelings that he was responsible for what Wisner had done, both because he didn't stop it and because he didn't tell anyone, exposing other veterans to Wisner's conduct as well.

b.  Plaintiff avoids eye contact when talking with others.  In the military mindset, not looking at others is a sign of weakness.  This quality indicates that plaintiff is still "beating himself up" over what happened with Wisner.  Plaintiff is ashamed that Wisner "duped" him, and he still sees images of the things Wisner did to him.

c.  Because of Wisner, plaintiff has experienced decreased sex drive.  He testified, credibly, that he has not engaged in sexual relations with his girlfriend for more than two years.

d.  A few times each week, plaintiff feels like life is not worth living.[14]

e.  Dr. Peterson opined credibly that Wisner's actions worsened plaintiff's PTSD. As a result of Wisner's acts, plaintiff's existing PTSD worsened and he experienced a new sexual trauma.  The compound effect of this so-called "complex PTSD" makes treatment more difficult.

f.  Plaintiff received a letter from Agent Baker on August 14, 2014, alerting him that the VA Office of Inspector General was reviewing allegations of inappropriate conduct at the Leavenworth VA Medical Center.  When plaintiff received the letter, he immediately knew the letter was about Wisner even though the letter did not specify.  After reading it, plaintiff experienced a wide range of emotions, including shock, fear, concern, shame, embarrassment, and humiliation.  Plaintiff melted down and blamed himself for not protecting himself.

---

[14]   This credible report about plaintiff's sensation is troubling.  But the court does take some solace in this more positive fact:  At the time Dr. Peterson examined him, plaintiff had not experienced suicidal ideation in two years.

g. The same day plaintiff received the letter from Agent Baker, he went to St. Luke's North Hospital because he was afraid he was going to kill himself.[15]  Plaintiff was admitted as an inpatient to the hospital.  This was the first time that plaintiff had gone to an emergency room because he feared that he would take his own life.  The court views this timing as direct, compelling evidence of the effect of Wisner's conduct on plaintiff.

h. There was a distinct change in plaintiff's psychiatric and addiction treatment, post-Wisner.

i. Plaintiff testified that after he received the letter, his sadness, depression, anxiety, and shame worsened.

j. Plaintiff's drug use escalated after plaintiff received the letter.  He felt emasculated, tricked, experienced a loss of self-worth, and felt a need to "be numb."  In January 2015, plaintiff was hospitalized again.  Counting the January 2015 hospital stay, plaintiff was hospitalized 12 times after his encounters with Wisner (10 of them followed receiving the letter from Agent Baker).  Before plaintiff began seeing Wisner, he had just one hospitalization.[16]

---

[15]   Plaintiff testified at trial that it was the following day.  The discrepancy is immaterial.

[16]   Defendant argued in its closing argument that temporal proximity alone is insufficient to show that plaintiff's hospitalizations were connected to Wisner's actions.  So that it's clear, the court's finding does not rest on the folly of *post hoc ergo propter hoc*.  The court does not find that every hospitalization, post-Wisner, can be blamed on Wisner's actions.  But the court does note that there is a distinctive difference between the number of hospitalizations pre- and post-Wisner (and, specifically, before and after receiving the letter from Agent Baker).  This difference, combined with persuasive and credible testimony by plaintiff and Dr. Peterson, convinces the court that plaintiff's mental health declined and his drug use increased because of his interactions with Wisner.

52. The court finds credible plaintiff's assertion that requiring him to return to the VA for psychotherapy renders treatment in that setting unlikely to succeed. In reaching this finding, the court finds testimony about the following facts credible and significant:

    a.  Plaintiff has returned to the VA for treatment post-Wisner. He has an ongoing "relationship," of sorts, with Dr. Pattison, who provides plaintiff with Suboxone to keep him off opiates and benzodiazepines. He sees Dr. Pattison for less than 20 minutes quarterly. But plaintiff has not had a psychotherapeutic relationship since 2015.

    b.  In January 2015, plaintiff informed VA physician Dr. Gadt-Johnson that he had experienced a major breach of trust by a VA staff member (referring to but not naming Wisner). He also completed a "Challenging Beliefs Worksheet" about the Wisner situation and how it made him feel about himself. At the time, plaintiff had been inpatient for seven weeks and talking to Dr. Gadt-Johnson was one of the hardest things plaintiff ever has done. Dr. Gadt-Johnson strongly encouraged plaintiff to consider sharing the situation with his outpatient provider for follow-up, but plaintiff didn't do so. Plaintiff explained he didn't do so because he didn't trust the providers at the VA.

    c.  Plaintiff worries about being judged by VA health care providers. This concern is particularly worrisome for VA providers he doesn't know and those who knew Wisner and those who plaintiff perceives as loyal to Wisner.[17]

---

[17] The court does not find or even imply that VA providers actually remain loyal to Wisner. Given the guilty verdicts against Wisner for aggravated criminal sodomy, aggravated sexual battery, and three other counts of sexual battery in a Kansas state court, the court finds that today's VA providers are not loyal to Wisner. Instead, the court's finding merely concludes that plaintiff harbors this concern.

d.  Plaintiff does not trust the VA.  Because he experienced institutional betrayal, he believes that everyone at the VA is "tainted."  The court is persuaded that this view, even if untrue, is a belief that plaintiff sincerely holds.

e.  Dr. Peterson opined that if plaintiff can find a doctor and therapist in the civilian setting who he could trust, he could develop a therapeutic alliance again.  He also opined that plaintiff is almost completely unable to engage with the VA treaters. The court finds Dr. Peterson's testimony on this subject credible.

53. Also, in material part, the court finds credible plaintiff's assertion that he can't return to the VA for his general health care—at least not for actual, meaningful appointments with physicians or primary care practitioners—until a significant amount of time has passed and plaintiff has participated in years of therapy.  In reaching this finding, the court finds plaintiff's testimony about the following facts credible and significant:

a.  Shortly after his experiences with Wisner, plaintiff was assigned a series of primary care providers from the VA, but he never saw them.  He testified that he never will trust the VA with his medical care again.  Plaintiff has things he needs medical treatment for, but he is neglecting his health because he does not want to return to the VA.  For example, he has not had any bloodwork done for a number of years and has not had a physical examination since his experiences with Wisner.

b.  Dr. Peterson credibly opined that returning to the same place where plaintiff was victimized would exacerbate or trigger plaintiff's PTSD.

54. The court finds that plaintiff's inability to return to the VA for medical care, however, has an outer limit.  It is more likely than not that plaintiff, through extensive and effective

psychotherapy and medication, can overcome his traumatic experiences with the VA. Also, it's more probable than not that that plaintiff can make this recovery by the time he reaches age 65.[18]  But based on plaintiff's credible testimony about his state of mind, the court believes that plaintiff faces a long and difficult road and his passage through these difficulties likely will include future challenges.  The court cannot say with any level of certainty that plaintiff will recover to a degree that he could begin using his VA health benefits again anytime soon—particularly when Dr. Peterson testified that plaintiff will need to continue psychotherapy indefinitely.  But, the court finds by a preponderance of evidence, plaintiff will recover sufficiently that he can begin using the VA's medical services again by the time he reaches age 65 and becomes eligible for Medicare.

55. Dr. Peterson recommends the following treatment for plaintiff, with the need for the treatment specifically arising from Wisner's actions:

    a.   medications estimated at $100 per month for each medication indefinitely, including at least two or three of the following medications:  Prazosin (for nightmare suppression), Propranolol (also for plaintiff's nightmares, but specifically to decrease the intensity of the physical and psychological reaction when a nightmare startles him from his sleep), and appropriate antidepressant

---

[18]  In his written Closing Argument Reply (Doc. 159), plaintiff argued he never will recover to the point that one reasonably could expect him to begin using the VA again for health care.  Both plaintiff and Dr. Peterson testified to this conclusion.  The court concludes, however, that plaintiff hasn't carried his burden of proof on this question.  Simply put, plaintiff hasn't proved that a reasonable person, in plaintiff's position, would choose to forego medical care in lieu of returning to the provider where plaintiff sustained the abuse that he sustained.  The evidence convinced the court of the powerful restorative value of prolonged psychotherapy and related treatment.  So, the court finds, plaintiff reasonably can return to the VA after some 25 years of intensive treatment.

medications focused on generalized anxiety disorder and PTSD (or mood

stabilization agents such as Abilify);[19]

b.  private psychiatric medication monitoring on a quarterly basis, indefinitely, at

$350 per hour; and

c.  trauma-focused, Ph.D.-level psychotherapy every other week for six to 12

months, then continuing monthly for five years, and then quarterly for an

indefinite amount of time, at a cost ranging from $175 to $300 per hour.

56. The court finds Dr. Peterson's treatment recommendations generally supported and

appropriately tied to Wisner's conduct, with one exception:  Dr. Peterson recommended

private psychiatric medication monitoring on a quarterly basis.  But plaintiff has been

receiving this monitoring from Dr. Pattison on a quarterly basis, averaging 16 to 18

minutes per appointment.  Plaintiff has a therapeutic relationship with Dr. Pattison, even

though Dr. Pattison has only managed plaintiff's substance abuse medication (Suboxone).

The court finds that it is feasible (and likely beneficial) for plaintiff to continue to receive

his medication management through Dr. Pattison and the VA.

57. Dr. Ward testified that the total present value of the PTSD treatment recommended by

Dr. Peterson ("PTSD Life Care Costs") is $413,941.

---

[19]  Dr. Peterson was ambivalent whether plaintiff would need both types of nightmare medication and whether
plaintiff would need both an antidepressant and mood stabilizer.  He testified plainly that plaintiff could
need one or both types of medication for his nightmares.  His testimony on the antidepressant and mood
stabilizer was more confusing; on direct examination, Dr. Peterson affirmatively answered a question by
plaintiff's counsel suggesting that two types of medical providers would need to discuss "appropriate
antidepressant medications *or* mood stabilization agents" for plaintiff.  But on cross examination, Dr.
Peterson specified that he was recommending both antidepressants *and* mood stabilizers for plaintiff.  Dr.
Peterson then concluded that he was recommending a total of three psychiatric medications in addition to
Suboxone.  But the court finds the testimony on this issue clear on just one point:  Dr. Peterson was not
recommending with sufficient certainty four different medications at $100 each per month, as Dr. John
Ward—plaintiff's expert witness specializing in economics—assumed in his damage calculations.

58. The court finds that Dr. Ward based his calculation, however, on assumptions that are inconsistent with the evidence.  Specifically, the court finds the following flaws with the calculation for "PTSD Life Care Costs":

    a.  Dr. Ward testified that the present value of plaintiff's psychiatric medications was about 60% of the total "PTSD Life Care Costs."  This calculates to around $248,000 for medication.  But Dr. Ward assumed that plaintiff needed four separate medications, at a cost of $100 each, per month.  Dr. Peterson's testimony about the number of medications that plaintiff needed, however, was unclear.  After reviewing his testimony closely, the court is uncertain how many types of medication—in Dr. Peterson's opinion—plaintiff will need.  But plaintiff did not meet his burden to show that he will need all four, or that each would average a cost of $100 per month.  To the contrary, defendant showed that the medications could be purchased for much less on the internet.  Moreover, Dr. Abrams testified that, in his experience, prescriptions could be filled through, and covered by the VA—even if prescribed by a non-VA provider.  The court finds that plaintiff could continue to fill his psychiatric prescriptions through the VA.

    b.  Dr. Ward calculated plaintiff's medication-monitoring appointments at $350 per quarter, indefinitely.  But Dr. Peterson testified that the rate *per hour* was $350.  Plaintiff's appointments with Dr. Pattison have averaged 16 to 18 minutes apiece, and the court heard no evidence providing a basis to conclude that a full hour per calendar quarter would be needed to discuss coordination of psychotherapeutic medications, along with Suboxone.  Inferring that it would take some amount of time longer than plaintiff's current appointments—perhaps up to 30 minutes,

since the consultation will involve more medications—the court concludes that Dr. Ward's total for these appointments is inflated by at least half. Moreover, as noted above, plaintiff's current therapeutic relationship with Dr. Pattison suggests that he could continue to see Dr. Pattison with the VA for his medication management.

c. Also, there is some question whether Dr. Ward's calculation for the cost of psychotherapy is inflated. At a minimum, it is confusing. The testimony never explained why Dr. Ward calculated the number of appointments as 4.3 per month for nine months, when Dr. Peterson testified that plaintiff should receive treatment every other week for six to 12 months.

59. Dr. Ward was asked to assume that plaintiff could never return to the VA for health care and thus calculated the present value of the replacement cost of plaintiff's VA health benefits. To calculate this cost, Dr. Ward found the insurance plan that would provide benefits most nearly like those provided by the VA. He then calculated the total cost, including deductibles and premiums for health, dental, and vision insurance from plaintiff's current age—which is 38 years old—to age 65. This value is $625,012.

60. Dr. Ward then calculated the deductibles and cost of Medicare parts A, B, D, and F from age 65 to plaintiff's life expectancy of 78.45. That value is $306,674.

61. The total for the three elements of economic damages calculated by Dr. Ward— replacement health care to age 65, Medicare costs after age 65, and PTSD Life Care Costs—is $1,345,628.[20]

---

[20] By the court's math, $413,941 + $625,012 + $306,674 = $1,345,627. The court assumes the one dollar difference is a rounding error. And in any event, it is immaterial.

## Conclusions of Law

### A.    Wisner's Actions Were Within the Scope of His Employment

1.   The United States is liable under the FTCA only for tortious acts committed by its employees while "acting within the scope of [their] office or employment."  28 U.S.C. § 1346(b)(1).

2.   The court determines "scope of employment" using the law of the place where the allegedly tortious act occurred—in this instance, Kansas.  *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011); *see also* 28 U.S.C. § 1346(b)(1).

3.   In Kansas, an employee acts within the scope of employment when (1) he performs services for which he has been employed, or (2) he does anything "reasonably incidental to [his employment]."  *O'Shea v. Welch*, 350 F.3d 1101, 1103 (10th Cir. 2003) (quoting Pattern Instructions Kansas 3d 107.06; *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301–02 (Kan. 1974)).[21]

---

[21]    The court notes that the Kansas Judicial Council has amended the Pattern Instructions Kansas 3d since *O'Shea* cited them.  The Pattern Instructions Kansas is now in its fourth edition.  The current model instruction omits much of the language quoted in *O'Shea*.  In the fourth edition, the model instruction simply recites, "The scope of employment is the complete range of activities an employee is authorized to perform and those an employee might reasonably be expected to perform while carrying out the business of the employer."  Pattern Instructions Kansas 4th 107.06.  But the Comment to the revised pattern instruction 107.06 discussed *O'Shea* with apparent approval.  Moreover, the Kansas Supreme Court relied on the second edition of pattern instruction 7.04 (which became 107.06 in the third and fourth editions) in several "scope of employment" cases.  *See, e.g.*, *Williams*, 520 P.2d at 1301–02; *Commerce Bank of St. Joseph, N.A. v. State*, 833 P.2d 996, 999 (Kan. 1992).  More recently, the Kansas Court of Appeals cited *Williams* and *Commerce Bank* for the "scope of employment" standard, using the identical language from the second and third editions of the model instruction, but attributing the language to the Kansas Supreme Court itself and not the older pattern jury instructions.  *Farmers Bank & Trust v. Homestead Cmty. Dev.*, No. 120,671, 2020 WL 5849345, at *15 (Kan. Ct. App. Oct. 2, 2020).  The Comment to the fourth edition of 107.06 also cites *Williams* and *Commerce Bank*, again with apparent approval.  Given this context, the court determines that the language in *Williams* and *Commerce Bank* remains a valid expression of the Kansas standard for determining whether conduct is within the scope of employment.  The court concludes that the guidance in *O'Shea* remains relevant and useful for evaluating employees' conduct.

4. As reiterated in *O'Shea*, the test does not ask whether the employer "expressly authorized or forb[ade]" the conduct.  350 F.3d at 1103 (quoting Pattern Instructions Kansas 3d 107.06).

5. Instead, the controlling test asks whether the employer should have "fairly foreseen" the conduct "from the nature of the [employment] and the duties relating to it."  *Id.* (quoting Pattern Instructions Kansas 3d 107.06); *see also Commerce Bank of St. Joseph, N.A. v. State*, 833 P.2d 996, 999 (Kan. 1992).

6. Applying this test to the evidence here reveals that a reasonable employer in the VA's position should have foreseen Wisner's tortious conduct.  Indeed, the VA actually did foresee it.  Multiple patients had complained to the VA about Wisner's conduct before and while he was treating plaintiff.  And Wisner was in the health care business—one where the risk for patient abuse is widely recognized.  Indeed, the VA has issued a variety of directives designed to minimize that risk.  Wisner's duties included meeting one-on-one with patients in closed-door examination rooms.  He engaged in full-body exams and asked intimate and probing questions.  All of Wisner's conduct was well within the scope of his employment.

7. In addition to this general determination, the parties agree that the "slight deviation" test, *O'Shea v. Welch*, 350 F.3d at 1106, applies to determine whether an employee's conduct was "reasonably incidental" to his employment—thus rendering the conduct within the scope of employment.  The *O'Shea* case certainly involved different facts than this case, but it provides helpful guidance showing how Kansas determines which actions are reasonably incidental to employment, qualifying the actions as ones within the scope of employment.

8.  "Application of the slight deviation analysis allows for more flexibility and accuracy in the application of the law to each fact scenario.  The Kansas pattern jury instruction[] . . . does not express a bright-line rule but instead illustrates a type of slight deviation rule which requires a determination of what is reasonably incidental to employment and what conduct should have been fairly foreseen."  *Id.*

9.  The slight deviation test allows an employee to pursue "dual purpose ventures" without wholly departing from the scope of employment.  *Id.* at 1107.  In using the phrase "dual purpose ventures," the Tenth Circuit cited the following language from a California appellate court case to help explain the term:  "Where the employee may be deemed to be pursuing a business errand and a personal objective simultaneously, he will still be acting within the scope of his employment."  *Id.* (citing *Felix v. Asai*, 237 Cal. Rptr. 718, 722 (Cal. Ct. App. 1987)).

10.  "An employee does not cease to be acting within the course of his employment because of an incidental personal act, or by slight deflections for a personal or private purpose, if his main purpose is still to carry on the business of his employer.  Such deviations which do not amount to a turning aside completely from the employer's business, so as to be inconsistent with its pursuit, are often reasonably expected and the employer's assent may be fairly assumed."  *Id.*

11.  Under Kansas law, six factors control the analysis whether an employee has engaged in a slight or substantial deviation:  (1) the employee's intent; (2) the nature, time, and place of the deviation; (3) the time consumed in the deviation; (4) the work for which the employee was hired; (5) the incidental acts reasonably expected by the employer; and (6)

the freedom allowed the employee when performing his job responsibilities.  *Id.* at 1108 (citation omitted).

12. Applying these factors to the court's factual findings, the court concludes that Wisner engaged in a slight deviation from his employment when he abused plaintiff, his patient. Specifically, his intent was mixed.  Wisner sought both to conduct thorough examinations and also satisfy his sexual curiosity (factor 1).  The deviations took place within the context of longer medical examinations in a medical exam room during regular clinic hours (factor 2).  The deviations themselves lasted less than a minute (factor 3).  Wisner was hired to physically examine patients, which included genital and rectal examinations when medically recommended (factor 4).  The VA received many complaints about Wisner's practices before and while he was seeing plaintiff as a patient, making his deviations foreseeable (factor 5).  The VA was well aware of the risks of patient abuse, rendering it reasonable to expect acts of sexual abuse could occur if it exercised legally inadequate supervision—which it did (factor 5).  Wisner was given wide latitude and freedom to perform his job responsibilities.  He was the only primary care provider in a clinic with as many as 1,000 veteran patients.  Although the VA was required to devote oversight to his patient interactions, the evidence shows that it neglected to review his activities (factor 6).  In sum, all six factors favor the conclusion that Wisner's deviation from his employment duties was slight, not substantial.

13. Applying the Kansas scope of employment test, the court concludes that Wisner acted within the scope of his employment, or reasonably incidental to it, when he conducted improper and unnecessary genital examinations on plaintiff.  The VA may therefore be liable for Wisner's conduct under the FTCA, absent some other bar to recovery.

**B.**     **The VA Immunity Statute Applies to Plaintiff's Claims**

14. The FTCA does not waive sovereign immunity for claims arising out of a battery.  28

U.S.C. § 2680(h) (exempting from its waiver "[a]ny claim arising out of assault, battery,

false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander,

misrepresentation, deceit, or interference with contract rights").

15. But § 2680(h) also establishes a statutory "exception to the exception."  Specifically, the

VA Immunity Statute allows a remedy against the United States under the FTCA for

damages arising from medical services provided by health care employees of the VA

under 38 U.S.C. § 7316(a)(1), (f).  *Ingram v. Faruque*, 728 F.3d 1239, 1245–46 (10th

Cir. 2013) ("'[Section] 2680(h) does not bar application of the FTCA to [intentional] tort

claims arising out of the conduct of VA medical personnel within the scope of' 38 U.S.C.

§ 7316(f).") (citation omitted).

16. The Tenth Circuit has explained the rationale for the VA Immunity Statute:  "In some

instances, State law characterize[d] an act of medical malpractice as an intentional tort,

leaving VA medical personnel potentially liable for an action for which the law intends

the Government to assume liability."  *Franklin v. United States*, 992 F.2d 1492, 1500

(10th Cir. 1993) (citing H.R. Rep. No. 100-191, 100th Cong., 2d Sess. 19 (1988),

*reprinted in* 1988 U.S.C.C.A.N. 432, 450).

17. The plain language of this exception-to-the-exception statute, however, does not confine

the statute's waiver to claims of medical battery.  Specifically, the Circuit has explained it

this way:

> Although Congress was specifically concerned with medical battery, the
> remedy available under § 7316(f) is not limited to battery.  Instead, by
> rendering 28 U.S.C. § 2680(h) inapplicable, § 7316(f) allows the United
> States to be sued for "assault, battery, false imprisonment, false arrest,

malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," . . . .  Thus, in the context of VA health care employees providing medical care or treatment, § 7316(f) provides a remedy under the FTCA for claims of intentional torts, including false arrest and false imprisonment.

*Ingram*, 728 F.3d at 1249.

18. To apply, § 7316(f) requires only that a battery be committed by VA personnel "in furnishing medical care or treatment."  38 U.S.C. § 7316(f).[22]  Now, in the full evidentiary context of a trial, the court recommits to the gravamen of its earlier rulings: the VA Immunity Statute's plain language controls, and it does not limit immunity to claims of medical battery.  *Doe A.L. v. United States*, No. 16-2627, 2020 WL 59861, at *4 (D. Kan. Jan. 6, 2020); *see also Doe S.B. v. United States*, No. 16-2575, 2020 WL 59646, at *4 (D. Kan. Jan. 6, 2020); *Doe P.M. v. United States*, No. 16-2315, 2020 WL 59645, at *4 (D. Kan. Jan. 6. 2020); *Doe D.P. v. United States*, No. 16-2267, 2020 WL 59640, at *4 (D. Kan. Jan. 6, 2020).

19. As noted in the court's Findings of Fact, Wisner's improper actions were taken while he furnished medical care or treatment.  They occurred during medical appointments, and while Wisner conducted medical and genital exams as part of his duties as a PA.  Although genital examinations were not medically indicated for plaintiff, they still could

---

[22]  The complete language of the statute requires that the negligent or wrongful act or omission be committed "in furnishing medical care or treatment . . . while in the exercise of such person's duties in or for the Administration."  Defendant now argues—by incorporating its brief (Doc. 119) from *John Doe P.M. v. United States*, No. 16-2315—that the last part of subsection(f) ("while in the exercise of such person's duties") provides another reason for rejecting plaintiff's position.  According to defendant's newest argument, plaintiff contends that anything occurring during a medical appointment falls under § 7316(f).  And, defendant continues, plaintiff's reading "violates the maxim that a Court must construe a statute to give effect to all of its provisions."  (*See* Doc. 119 at 7 of the *John Doe P.M.* case, No. 16-2315.)  But in the court's judgment, plaintiff doesn't argue that *any act* during a medical appointment would qualify under § 7316(f).  Instead, Wisner's tortious acts fall under the statute—plaintiff argues—because they were part of more extensive medical examinations.  Also, they occurred while Wisner exercised his duties for the Veterans Administration—which, in Wisner's case, include providing medical care and treatment.  The last part of the statute does not render the "in furnishing medical care" language useless.

serve a medical purpose—although Wisner conducted them improperly, without gloves. The court again rejects defendant's position that "sexual molestation" can never qualify as "medical care or treatment."  (Case No. 16-2315, Doc. 119, at 6, 8.)  Defendant's argument artificially compartmentalizes Wisner's behavior in a fashion contradicting the evidence.  Defendant's argument conflicts with the actual evidence showing how, when, and where Wisner committed tortious acts.  In so doing, defendant improperly simplifies the analysis and glosses over the plain language of the statute.  When Wisner touched plaintiff, he did so within the larger context of a medical appointment and a physical examination—a job duty he discharged regularly.  The court concludes that Wisner was engaged in the process of furnishing medical care when he committed his wrongful acts.

20. Defendant cites a recent Eleventh Circuit case to support its argument, *Knezevich v. Carter*, 805 F. App'x 717 (11th Cir. 2020).  The Eleventh Circuit decided this case after the court's earlier orders on this subject.[23]  In *Knezevich*, plaintiff brought a defamation claim against his VA doctor because the VA doctor, while discussing a surgical procedure with plaintiff, yelled into the hallway that the plaintiff was threatening him.  A nurse already had taken plaintiff's vital signs, and the doctor had drawn the shape of an incision on the plaintiff's chest when the doctor's outburst occurred.  The Eleventh Circuit separated the "harm-causing conduct"—the doctor's hallway defamation of the plaintiff—from the rest of the medical appointment, noting that checking vital signs and drawing the incision's shape were "not what allegedly caused [the plaintiff] harm."  *Id.* at 725.

---

[23] Defendant does not actually cite *Knezevich* in this case, but instead incorporated its brief from *John Doe P.M. v. United States*, 16-2315 (Doc. 119).

21. *Knezevich*'s facts differ from the ones in this case.  The tort alleged in *Knezevich*—defamation—had a distinct beginning and end and was easily separated from the medical care provided by the doctor.  In contrast, in this case, the edges of the boundary separating Wisner's proper medical care from his wrongful conduct are far less distinct.  Wisner's job included full genital examinations for his patients' medical care.  It was never appropriate to conduct a genital exam without gloves, but performing the exam itself still had a valid basis in medical care.  Wisner just executed it improperly.  And even when not medically indicated, the examination still could serve a medical purpose.  The line dividing an intentional tort and from conduct not constituting an intentional tort is much more muddled here than in *Knezevich*.

22. For these reasons, the court concludes that the rationale of *Knezevich* does not apply to this case.  It does not justify modifying the court's earlier rulings defining the boundaries of the operative phrase—"in furnishing medical care or treatment."

23. Because Wisner's improper actions were committed "in furnishing medical care or treatment," the VA Immunity Statute applies and, on these facts, waives the sovereign immunity of the United States.

**C.      Plaintiff Has Met the Elements of His Medical Malpractice Claim**

24. Because plaintiff's medical malpractice claim has survived defendant's various challenges, the court now must evaluate whether plaintiff has carried his burden to prove all three elements of his claim.  These elements are (1) a duty to meet or exceed a certain standard of care; (2) a breach of that duty; and (3) the breach proximately caused the

patient's injury. *Nold v. Binyon*, 31 P.3d 274, 285 (Kan. 2001); *Wozniak v. Lipoff*, 750 P.2d 971, 975 (Kan. 1988).[24]

25. *First:  Duty.*  Plaintiff presented evidence—by way of expert testimony—establishing the standard of care.  That expert testimony provides the standard by a preponderance of the evidence on the following subjects.  <u>One</u>, gloves are always required when conducting genital or rectal examinations under the relevant standard of care.  <u>Two</u>, genital and rectal examinations are not required at every visit; only when medically indicated or necessary.  <u>Three</u>, when genital or physical exams are conducted, certain disrobing practices should be used and sensitive matters should be discussed in a proper manner.  <u>Four</u>, Wisner, as a PA, had a duty to comply with this standard of care.

26. *Second:  Breach.*  Plaintiff's proof carried his evidentiary burden and thus proved that Wisner breached the standard of care.  Specifically, every time Wisner conducted a genital examination without using gloves, he violated the standard of care.  And all of the genital examinations he conducted on plaintiff were unnecessary.  This conduct also violated the standard of care, as did Wisner's disrobing practices and inappropriate sexual commentary.

27. *Third:  Causation of Injury.*  Plaintiff also proved by a preponderance of the evidence that he suffered harm as a proximate result of Wisner's breach of the standard of care.  The court will address the extent of this harm in light of plaintiff's pre-existing conditions later in this Memorandum of Decision.  But, for now, the court finds that Wisner's acts caused plaintiff harm independent of his pre-existing conditions.

---

[24]  The court only considers the merits of this claim with respect to the actions of Wisner himself as the tortfeasor.  While the court has considered the actions or inactions of other VA actors for purposes of its foreseeability analysis and other contextual purposes, plaintiff only preserved a claim for recovery based on Wisner's actions.

28. Because plaintiff has shown that all three elements of a medical malpractice claim are met, the court next addresses the last element—the extent of damages plaintiff sustained by Wisner's conduct.[25]

**D.    Damages**

29. Plaintiff requests economic damages in the amount of $1,345,628—the value of recommended treatment, plus the cost of private health care equivalent to what plaintiff had earned the right to receive for free from the VA.  In an earlier, related case, defendant asked the court to place any economic damage award in a reversionary trust.  In this case, the court asked the parties to brief whether any award in this case should be placed in a reversionary trust.

30. Plaintiff also requests non-economic damages in the total amount of $5,382,512, broken down in this fashion:  $1,345,628 for pain; $1,345,628 for suffering; $1,345,628 for disability (PTSD); and $1,345,628 for mental anguish.

31. Kansas law governs the court's consideration of plaintiff's damages request.  *Hatahley v. United States*, 351 U.S. 173, 182 (1956) ("Under the [FTCA], damages are determined by the law of the State where the tortious act was committed."); 28 U.S.C. § 1346(b).

---

[25]    Plaintiff also seeks to recover on a claim for intentional infliction of emotional distress.  But the court already has determined that plaintiff is entitled to recover from the VA on his medical malpractice claim.  Any recovery for intentional infliction of emotional distress would duplicate plaintiff's malpractice claim, so the court need not address the claim further, except to note this one point:  To the extent that plaintiff is still trying to bring this claim against the VA for actions (or inactions) by Wisner's supervisors, he may not do so.  Plaintiff administratively exhausted claims solely based on Wisner's personal conduct.  "[A]lthough a plaintiff's administrative claim need not elaborate all possible causes of action or theories of liability, it must provide notice of the facts and circumstances underlying the plaintiff's claims." *Estate of Trentadue v. United States*, 397 F.3d 840, 853 (10th Cir. 2005) (internal quotations omitted).  Plaintiff did not mention or otherwise reference any action or inaction by Wisner's supervisors (or the VA as an entity) in his administrative claim.  For an FTCA claim, each individual claimant must exhaust his individual claims before filing suit.  *Haceesa v. United States*, 309 F.3d 722, 734 (10th Cir. 2002).  The court therefore concludes that plaintiff has failed to exhaust an intentional infliction of emotional distress claim based on the actions of anyone other than Wisner.  And even if the court were to consider the merits of an intentional infliction of emotional distress claim, it would limit that claim to actions taken by Wisner himself.

32. A plaintiff may recover for medical expenses and economic loss he is reasonably expected to suffer in the future.  Pattern Instructions Kansas 4th 171.02 (citing Kan. Stat. Ann. § 60-249a).  And a plaintiff may recover noneconomic loss for "pain, suffering, disabilities, disfigurement and any accompanying mental anguish."  *Id.*

33. Kansas law allows a plaintiff to recover for aggravation or activation of a preexisting condition.  Pattern Instructions Kansas 4th 171.43 ("[I]f the plaintiff had a preexisting physical ailment, defect or disability and you find this condition was aggravated or made active causing increased suffering or disability, then the plaintiff is entitled to recover for such increased suffering and disability.") (citing *Cott v. Peppermint Twist Mgt. Co.*, 856 P.2d 906 (Kan. 1993); *Rowe v. Maule Drug Co.*, 413 P.2d 104 (Kan. 1966); and *Knoblock v. Morris*, 220 P.2d 171 (Kan. 1950)).

34. Plaintiff undoubtedly suffered from PTSD and drug addiction before he ever encountered Wisner.  The court heard persuasive testimony that plaintiff's condition was aggravated after he learned that Wisner had manipulated him for sexual gratification.  Likewise, the court accredits plaintiff's evidence that plaintiff continues to suffer from aggravated PTSD.  The court finds that plaintiff deserves to recover damages in some amount.  The court next examines, first, whether any economic damages are warranted, and, if so, how much.  The court then turns to non-economic damages.  The analysis concludes with the reversionary trust issue.

**Economic Damages**

35. Plaintiff requests two kinds of economic damages:  value of recommended treatment for his PTSD and anticipated costs of private health care, assuming he never returns to the VA to receive care.  The court concludes that the evidence supports an award allowing

plaintiff to seek treatment—outside the VA—for his PTSD, depression, anxiety, and other mental health and addiction problems caused by Wisner.  Also, the evidence supports an award of damages equivalent to the cost of securing private health care until age 65.  This award will enable plaintiff to secure equivalent health insurance to replace the VA health care that, in effect, Wisner's conduct took from plaintiff.

36. Allowing plaintiff to seek some treatment for his PTSD and related problems, *outside* the resources provided by the VA, is supported by evidence about the nature of harm inflicted by Wisner's conduct.[26]  Requiring plaintiff to return to the VA for treatment necessitated by wrongdoing inflicted on him by one of the VA's providers is both unjust and illogical.  Also, here, it is likely to be unproductive.  The court accredits the expert testimony that plaintiff is unlikely to develop a trusting therapeutic alliance with VA providers, *i.e.*, open up to or trust VA providers to treat mental health issues caused by one of their former colleagues.  The court also accredits plaintiff's testimony that—post-

---

[26] The court heard evidence—over plaintiff's objections—about another option for health care, the VA Choice program.  Plaintiff contends that evidence about availability of benefits through the VA Choice program violates the collateral source rule.  The court allowed testimony about VA Choice, but advised the parties after the evidence was concluded that they could brief the issue whether the collateral source rule applied.  The court affirms its ruling that evidence about the possibility plaintiff could receive benefits through the VA Choice program is *not* barred by the collateral source rule.

This rule precludes evidence of other benefits available to a plaintiff, offered to benefit a tortfeasor by reducing its liability for damages.  *Martinez v. Milburn Enters., Inc.*, 233 P.3d 205, 221 (Kan. 2010).  Here, it is not clear that the VA Choice program always would be available to plaintiff—or that it would provide, when available, benefits comparable to those provided for combat veterans at VA facilities.  The court therefore finds evidence about the program unhelpful in determining plaintiff's damages (and, in any event, inadmissible for that purpose).

But while the evidence is unhelpful, the court finds it admissible for another purpose:  plaintiff's damages model asks the court to award plaintiff money so he can secure equivalent private health insurance because he cannot return to the VA for care.  Defendant offers evidence of the VA Choice program to show that plaintiff has a viable way to continue using his VA benefits without having to return to the VA facilities where he was sexually abused.  For this purpose, the court finds evidence about the program, though admissible without offending the collateral source doctrine, unhelpful to its damage analysis.  At bottom, the court's decision to admit evidence of the VA Choice program does not affect the outcome of any issue in this case.

Wisner—he cannot trust the VA to treat his wartime trauma but that he believes he could trust the right civilian therapist to treat both Wisner-related and wartime trauma. The fact that plaintiff barely opened up to Dr. Gadt-Johnson after nearly seven weeks of intensive inpatient treatment supports this conclusion.

37. Plaintiff credibly testified that he will seek the recommended treatment and that he sincerely wants to improve his mental health. The court accredits plaintiff's testimony on this point, finding plaintiff's statement sincere. Unfortunately, properly valuing the cost of this treatment proves difficult.

38. Plaintiff presented evidence by his expert economist, Dr. Ward, designed to value the cost of treatment for plaintiff's PTSD and related problems. Dr. Ward opined that the cost of securing this treatment is $413,941. But defendant's cross-examination persuasively challenged two components of Dr. Ward's opinion.

39. *First*, Dr. Ward valued the cost of acquiring prescriptions recommended by Dr. Peterson—plaintiff's expert psychiatrist—at $248,000.[27] But defendant's cross-examination of Dr. Ward showed that his calculation was inflated by assumptions contradicting Dr. Peterson's testimony about the medications plaintiff needs. Also, the evidence in this trial, unlike earlier trials of related cases, established that plaintiff could fill prescriptions through VA pharmacy services even if prescribed by a non-VA doctor. In this respect, this evidence distinguished the case from others already tried by the court. Given plaintiff's evidentiary shortfall, plaintiff has failed to carry his burden to establish that the injury caused by defendant deprived him of access to the prescriptions he will

---

[27] Dr. Ward did not specify a precise amount for these medications. He testified that the present value of plaintiff's psychiatric medications was about 60% of the total "PTSD Life Care Costs." Sixty percent of $413,941 is about $248,000.

need.  And even if he had proved that missing link, he has not proved the value of those

prescriptions by a preponderance of the evidence.  The court thus declines to award

plaintiff any damages for "PTSD Life-Care Prescription Costs."

40. *Second*, plaintiff seeks an award of $165,941 to pay for psychotherapy (sometimes called

"talk therapy") and prescription management appointments.[28]  Once again, defendant

effectively challenged the accuracy of this calculation.  Namely, it was difficult to discern

how much of this $165,941 is ascribed to prescription management and how much to

psychotherapy.  But acting on the best information in the record, the court concludes that

$51,300 of the $165,941 figure consists of psychotherapy costs.[29]  The court concludes

that plaintiff has carried his burden to prove that Wisner's conduct caused an injury

requiring substantial psychotherapy treatment for the rest of his life.  Dr. Peterson

estimated the cost of this psychotherapy at $175 to $300 per hour and defendant didn't

challenge that price range.  Using the midpoint of this range—$237.50 per hour—the

court concludes the cost of securing this treatment is $51,300.  This figure is derived

from the frequency and duration of treatment supported by Dr. Peterson's expert opinion,

*i.e.*, (a) an hour-long session, every other week for nine months (the midpoint of Dr.

Peterson's opinion of six to 12 months) ($4,750); (b) 60 hour-long sessions, spread over

the next five years (one session per month) ($14,250); and (c) 136 hour-long sessions,

conducted quarterly (four per year), spread over 34 years, through plaintiff's estimated

---

[28]   Again, Dr. Ward did not specify this amount in his testimony.  This figure is reached by subtracting
$248,000 (for medication) from the total "PTSD Life Care Costs" of $413,941.

[29]   The court recognizes that $165,941 is the present value of future care, which means that Dr. Ward
projected costs into the future and then discounted the number to present value.  The court does not have
evidence to explain Dr. Ward's calculation process such that the court feels competent to apply it.  The
court is therefore left to calculate values based only on the hourly provider charges and frequency of visits
that the evidence supports.

life expectancy of age 78 ($32,300).  The court thus awards a total of $51,300 to make

plaintiff whole for the cost of securing psychotherapy designed to treat PTSD and related

mental health problems caused by the VA's employee, Wisner.

41.  This leaves the second half of the second component of plaintiff's PTSD treatment

damages.  This portion of plaintiff's request seeks damages to pay for prescription

management by an appropriately trained medical provider.  Plaintiff seeks some portion

of the $165,941 as damages for the cost of securing medication management of

prescriptions to treat PTSD caused by Wisner's conduct.  The evidence established that

plaintiff has developed a sufficient relationship with the VA's Dr. Pattison, who has

provided this service to plaintiff for the last four years.  And, importantly, plaintiff has

continued to see Dr. Pattison in this capacity after he learned that Wisner had sexually

abused him.  Given this evidence, the court concludes that plaintiff has failed to prove

that Wisner's conduct—conduct for which the VA is liable—has deprived plaintiff of this

benefit.  In sum, plaintiff has failed to prove that an award of some portion of $165,941

or, indeed, any award of damages to replace this service is warranted.  Putting it simply,

plaintiff has not proved an injury warranting an award of damages based on this part of

his claim.

42. This conclusion leaves plaintiff's next damage component.  It seeks to recover the value

of plaintiff procuring ongoing private health care insurance.  The evidence in this case

justifies such an award.  Plaintiff has proved that the VA's tortious conduct effectively

compromised his ability to receive necessary medical care from the VA.  Indeed, plaintiff

effectively proved that the VA's wrongful conduct quashed his right to access to VA-

provided medical care.  In the years since Wisner, plaintiff has not seen a primary care

practitioner.  He has neglected his physical health because he distrusts the providers in the VA system.  While Wisner was the actor, plaintiff testified credibly that Wisner's actions have caused plaintiff to lose trust in the entire VA system (even in doctors in general).  Plaintiff's testimony, coupled with testimony by Dr. Peterson that validated plaintiff's distrust, convinces the court that Wisner's actions caused plaintiff to lose trust in the VA medical system.  The court has no expectation that plaintiff would alter his practices to utilize the VA for necessary preventative, maintenance, and diagnostic care—rendering his VA health benefits useless to him.

43. At first blush, this form of damages seemed unusual to the court.  But courts have approved similar damage awards because a prevailing plaintiff should not be forced to return time-after-time to his tortfeasor for care.  *See, e.g.*, *Molzof v. United States*, 6 F.3d 461, 468 (7th Cir. 1993) ("[W]e share the reluctance of other courts addressing this issue to deny the plaintiff the freedom to choose his medical provider and, in effect, to compel him to undergo treatment from his tortfeasor.").  The damages in *Molzof* and similar cases involved future medical expenses directly caused by the tortfeasor, which distinguishes them from this case's claim.  But still, they provide guidance that the court finds persuasive:  Because of Wisner's conduct, plaintiff views the VA—Wisner's former employer—as his tortfeasor.  This view is supported by the controlling law because the United States is legally liable for Wisner's conduct.  The court concludes plaintiff has proved that an award allowing him to secure health care through providers other than the VA is necessary to make him whole.  In summary form, by his combat service to the United States, plaintiff had earned the right to free medical care at VA facilities.  Wisner's conduct—conduct for which the United States is liable—deprived plaintiff of

that right.  Plaintiff has adduced persuasive evidence that one way to make him whole for
that loss is a damages award sufficient to replace that right by purchasing equivalent
private health care insurance.  Defendant came forward with no evidence of an alternative
measure of damages for this loss.[30]

44. As noted earlier, the court is mindful that plaintiff has returned to the VA for some
mental health treatment after learning of Wisner's transgressions.  But using the VA for
necessary emergency treatment was justified; plaintiff's drug use had spiraled, and he
was trying to get help from any available source.  To hold that plaintiff should have
continued to succumb to his addictions and avoided the free care the VA offered is
illogical.  The court thus awards plaintiff the present value of his VA health benefits, but
only through age 65, as calculated by Dr. Ward, in the total amount of $625,012.  This
award does not include, however, Medicare costs from age 65 through plaintiff's life
expectancy of 78.45 (which Dr. Ward valued at $306,674).  The court next explains why
it does not award for the cost of health care after age 65.

45. Consistent with the court's Findings of Fact above, the court concludes that awarding
plaintiff the value of VA health benefits after plaintiff becomes eligible for Medicare is
not supported by the evidence.  By age 65, plaintiff will have had the opportunity to make
a substantial investment in his mental health—more than 25 years of private treatment, by
the court's count.  At trial, plaintiff demonstrated a strong desire to secure help for his
mental struggles and addictions.  The evidence supports a determination that plaintiff,

---

[30]  Indeed, defendant's only response to plaintiff's injury is to redirect him to the VA and require him to secure
his health care from the tortfeasor who injured him in the first place.  The evidence persuades the court that
a reasonable person in plaintiff's position would not return to the VA for that purpose.  And separately, the
evidence persuades the court that plaintiff will not return to the VA for that purpose.  It is undisputed that
plaintiff has decided to forego important medical services offered by the VA because of Wisner's conduct.
In the court's judgment, defendant's argument offers plaintiff no remedy at all for this injury.

motivated by this desire and armed with the economic wherewithal provided by the court's award of damages, can recover to a degree that awarding damages for private health benefits outside the VA after age 65 is unnecessary. The court therefore determines that plaintiff should receive the value as calculated by Dr. Ward for VA health benefits through age 65—$625,012. But an award addressing medical benefits beyond that point is too speculative to tie to plaintiff's injuries, as Kansas law requires.

46. Adding the lifetime "PTSD Life Care Costs" of $51,300 to the present value of VA health benefits through age 65, the court awards plaintiff economic damages totaling $676,312.

## Non-Economic Damages

47. The court now turns to non-economic damages. Plaintiff asks for compensation for four distinct injuries: pain, suffering, disability, and mental anguish. The court agrees that plaintiff has suffered non-economic damages. But the court does not find plaintiff's calculation of those damages arising solely from Wisner's actions persuasive. Plaintiff asks the court to award $1,345,628 for each of the four types of injury, a total of nearly $5.4 million.

48. Kan. Stat. Ann. § 60-249a requires that the trier of fact itemize the amount of non-economic damages in the categories of (1) pain and suffering, (2) disability, and (3) disfigurement, and any accompanying mental anguish. The same statute requires the court to itemize those three categories of damages "to reflect those amounts awarded for damages sustained to date and those awarded for damages reasonably expected to be sustained in the future." *Id.*

49. Plaintiff's requested damage categories do not align precisely with the itemization required by Kansas law.  Plaintiff also has not separated his request into damages to-date and future damages.  But plaintiff's model nonetheless provides something of a starting point and assists the court's efforts to fashion its award.

50. The court believes that plaintiff has overreached by requesting distinct damages for (1) pain, (2) suffering, (3) disability, and (4) mental anguish.  To be sure, dividing his alleged non-economic damages into these four categories provides a multiplier enabling a larger request.  But this approach is not grounded in Kansas law.  Under the plain language and structure of § 60-249a, the court must separate non-economic damages into three categories:  "(A) Pain and suffering, (B) disability, (C) disfigurement, and any accompanying mental anguish."  Pain and suffering are not separated from one another.  And "mental anguish" is listed in the same statutory subsection (§ 60-249a(1)(C)) as disfigurement—an injury plaintiff has not experienced here.[31]  The court therefore finds it appropriate to limit (and itemize) the non-economic damages to the two categories actually supported by the evidence:  (1) pain and suffering (to-date and future) and (2) disability (to-date and future).

---

[31] Plaintiff cites Pattern Instructions Kansas 4th 171.02 to support his approach of itemizing damages into four categories.  In fairness, the court can accept the proposition that 171.02 suggests this approach—or at least makes the appropriate approach murky.  It provides, "Noneconomic loss includes pain, suffering, disabilities, disfigurement and any accompanying mental anguish suffered as a result of plaintiff's injuries to date (and the noneconomic loss plaintiff is reasonably expected to suffer in the future) . . . ."  The model instruction also advises, "There is no unit value and no mathematical formula the court can give you for determining items such as pain, suffering, disability, and mental anguish."  The placement of punctuation in either sentence does not mirror the punctuation used in § 60-249a.  In the first sentence of 171.02, pain and suffering are separated a comma, but "any accompanying mental anguish" is not separated from disfigurement by a comma—which either represents a conscious decision not to use an Oxford comma or an indication that mental anguish is considered only if it accompanies disfigurement.  In the second sentence in 171.02, disfigurement is not mentioned and mental anguish is listed as a fourth item.  The court declines to speculate whether the model instruction's slight differences from § 60-249a were intentional or unintentional.  Instead, the court believes the better approach is for the court to follow the language and structure of the statute, not the language used in the pattern jury instruction.

51. To say the least, quantifying non-economic damages represents a daunting task.  In Kansas, when courts instruct juries how to assess damages for pain and suffering, they typically provide this guidance, "There is no unit value and no mathematical formula the court can give you for determining items such as pain, suffering, disability, and mental anguish.  You must establish an amount that will fairly and adequately compensate the plaintiff.  This amount rests within your sound discretion."  Pattern Instructions Kansas 4th 171.02.

52. The trier of fact here is the court—not a jury.  When assessing non-economic damages, the court follows the guidance of the Kansas Pattern Instruction and the counsel of the Kansas Supreme Court.  That court has explained, "'Pain and suffering have no known dimensions, mathematical or financial.  There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents.  For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence.'"  *Kan. Malpractice Victims Coal. v. Bell*, 757 P.2d 251, 260 (Kan. 1988), *disapproved of on other grounds by Bair v. Peck*, 811 P.2d 1176 (Kan. 1991) (citation omitted); *Tucker v. Lower*, 434 P.2d 320, 327 (Kan. 1967) ("There is no exact yardstick by which pain and suffering can be measured and the various factors involved are not capable of proof in dollars.  For this reason the only standard for evaluation is such amount as twelve reasonable persons estimate to be fair compensation when that amount appears to be in harmony with the evidence and arrived

at without passion or prejudice.").  While the standard isn't particularly satisfying—

particularly when one reasonable person must apply it, not 12—the court is mindful of

two things.  One, the Kansas Supreme Court is in charge of the legal standards deployed

under that state's law.  This court must follow them when, as here, they control an aspect

of a federal court lawsuit.  And two, trying to define a workable measure for this kind of

damages is challenging legal work.  The court's observation about the Kansas standard

doesn't imply that it could do a better job.

53. The caselaw reporting and reviewing jury awards of non-economic damages reflects the

unprecise nature of this endeavor, even within the same jurisdiction, and involving the

same defendant.  *Compare Howsmon v. Ricci*, 1993 WL 794315 (Cal. Super. Ct. Trial

Div. 1993) (reporting $325,000 jury verdict for non-economic damages after doctor

negligently performed unnecessary rectal examination at physician's office, committing a

sexual battery) *with Prendergast v. Ricci*, 1994 WL 847897 (Cal. Super. Ct. Trial Div.

1994) (reporting a $100,000 "general damages" jury verdict after same doctor performed

rectal examinations—plural—and sexually assaulted plaintiff during the exams); *see also*

*Elk v. United States*, 87 Fed. Cl. 70, 97 (Fed. Cl. 2009) (awarding $250,000 for pain and

suffering after Army officer sexually assaulted prospective soldier during recruitment

process).  Plaintiff urges the court not to use this case law as guidance.[32]  But the court

has not used the examples to *develop* its numbers for non-economic damages.  Instead,

---

[32] Actually, plaintiff suggests the court should consider case law as guidance—he just wants the court to use a different case than the ones identified above.  *See* Doc. 159 at 26, *citing Mirlis v. Greer*, 952 F.3d 36 (2d Cir. 2020), where a jury verdict for sexual acts was much higher.  In *Mirlis*, a jury found that a Jewish rabbi had sexually molested a student for years.  The jury awarded $15 million in compensatory damages and the court thereafter awarded $5 million in punitive damages.  Presumably because this verdict was so much higher than the cases the court cited, plaintiff suggests that jury verdicts may not be the best guideposts.  Plaintiff is correct; the verdicts in the cases the court reviewed varied wildly.  This is why the court did not use the sample cases as a starting point, but merely to make a point and as a cross-check.

the court cites these examples to demonstrate how much awards vary and as a something of a cross-checking device.

54. Using Kansas law for guidance, the court finds that an appropriate award for plaintiff's pain and suffering to-date is $170,000.  For future pain and suffering, the court awards $50,000.   For plaintiff's disability to-date, the court awards $110,000.  For future disability, the court awards $40,000.  These amounts (totaling $370,000) represent the value that the court—as finder of fact—attributes to the non-economic harm caused by Wisner's conduct exacerbating plaintiff's pre-existing conditions.  The record firmly establishes that plaintiff's conditions worsened after he learned that Wisner had manipulated and sexually molested him.

55. For ease of reference, the court summarizes its damages awards in the following chart:

| Plaintiff Doe D.P. Chart of Damages | | |
|---|---|---|
| | **Requested Amount** | **Amount Awarded** |
| Economic Damages - PTSD Life Care – Prescription | $248,000 | $0 |
| Economic Damages - PTSD Life Care – Psychotherapy Cost | $165,941 | $51,300 |
| Economic Damages – PTSD Life Care – Medical Management | | $0 |
| *Economic Damages – Total PTSD Life Care* | *$413,941* | *$51,300* |
| Economic Damages – VA Health Care Replacement to Age 65 | $625,012 | $625,012 |
| Economic Damages – VA Health Care Replacement from Age 65 – 78 | $306,674 | $0 |
| ***TOTAL ECONOMIC DAMAGES*** | ***1,345,628***[33] | ***$676,312*** |
| Non-Economic Damages - Pain & Suffering To-Date | $1,345,628 x 4 = $5,382,512 | $170,000 |
| Non-Economic Damages – Future Pain & Suffering | | $50,000 |

[33] *See supra* footnote 20.

| | | |
|---|---|---|
| Non-Economic Damages - Disability To-Date | | $110,000 |
| Non-Economic Damages – Future Disability | | $40,000 |
| **TOTAL NON-ECONOMIC DAMAGES** | **$5,382,512** | **$370,000** |
| **TOTAL ECONOMIC + NON-ECONOMIC DAMAGES** | **$6,728,139** | **$1,046,312** |

**Proposed Reversionary Trust**

56. Finally, the court asked the parties to brief the propriety of placing any economic damages in a reversionary trust—a measure defendant asks the court to impose. At the end of the trial, the court explained to the parties that it had not yet made a determination on liability; but, if the court did find for plaintiff and award damages to plaintiff, the court might ask the parties to weigh in on defendant's trust proposal. The court emphasized this concern here because, sadly, plaintiff has experienced several relapses of his substance abuse problems. The court was trying to identify legally available options, in case of an award for plaintiff, to protect the award and plaintiff from the risks of unlimited access to untethered funds. Plaintiff indicated in his brief that he opposes a *reversionary* trust, but he is willing to entertain other mechanisms to ensure that funds for future medical expenses are used for that purpose.

57. Tenth Circuit law has approved reversionary trusts when it is in a minor's best interest. *Hull v. United States*, 971 F.2d 1499, 1504 (10th Cir. 1992); *Hill v. United States*, 81 F.3d 118, 121 (10th Cir. 1996) (recognizing inherent authority to create a reversionary trust if it is "in the best interests of the child"); *cf. Duplan v. Harper*, 188 F.3d 1195, 1202 (10th Cir. 1999) ("The damages belong to the true plaintiffs, the [parents], and the district court would have erred in imposing a trust on this award in the absence of their consent."). But plaintiff here isn't a minor and he hasn't consented to a reversionary

trust.  To the contrary, he opposes it.  Nevertheless, in at least one case, a court has imposed a reversionary trust when the plaintiff was *not* a minor.  *See, e.g.*, *Deasy v. United States*, 99 F.3d 354, 359–60 (10th Cir. 1996) (affirming district court's award of damages to fund veteran's lifetime medical and psychiatric care outside the VA, when the award was placed in a reversionary trust).

58. In an earlier related case, the court considered imposing a reversionary trust, but ultimately decided that the evidence did not warrant it.  *Leininger v. United States*, No. 16-2627-DDC, 2020 WL 6392458, at *19 (D. Kan. Nov. 11, 2020).  But the damages award in this case is greater and the evidence of plaintiff's addiction struggles is more extensive.  The court believes some sort of trust is appropriate—but not a reversionary trust.  With a reversionary trust, the damages awarded to make plaintiff whole would revert to defendant if not used by plaintiff for medical care.  As in *Leininger*, the court understands defendant's concern that it might have to fund plaintiff's psychiatric and medical care twice, *i.e.*, once by the damage award made in this Memorandum of Decision and again if plaintiff presents himself at a VA clinic in the future.  But this concern still overlooks two important truths.  One, the United States already owes plaintiff veteran benefits for combat service he has rendered to the United States Marines.  And two, as in *Leininger*, plaintiff sustained significant psychiatric injuries by virtue of that service.  The court remains unconvinced that defendant's concern merits imposing a reversionary trust.

59. Hoping to balance the competing interests in the most just way possible, the court directs plaintiff to submit a status report about his efforts, if any, to adopt procedures that would protect the portion of plaintiff's award of damages for funding his acquisition of private

health care coverage—$676,312.  Plaintiff must submit this report as soon as possible but in no event later than 30 days after the date of this Memorandum of Decision.  The court will review that report and schedule appropriate proceedings following its review of plaintiff's report.

**IS THEREFORE ORDERED** that the court finds in favor of plaintiff and against defendant.  When the court concludes the post-trial proceedings about procedures for protecting the health care component of its award, the court will direct the Clerk of Court to enter judgment in plaintiff's favor and against defendant United States in the amount of $1,046,312.

**IT IS FURTHER ORDERED** that plaintiff submit a status report about his efforts, if any, to adopt procedures that would protect the portion of plaintiff's award here of damages awarded to fund his acquisition of private health care coverage as soon as possible, but no later than 30 days after the date of this Memorandum of Decision.

**IT IS FURTHER ORDERED** that before the Clerk of Court enters judgment, plaintiff must resolve his case against the other outstanding defendant, Mark Wisner.  Plaintiff is therefore ordered to show cause within 14 days of the date of this Order why his claims against defendant Wisner should not be dismissed without prejudice for failure to prosecute.  If plaintiff seeks another resolution of his claims against defendant Wisner, he must identify that outcome (and provide legal authority supporting his proposal) in his response to the show cause order.

**IT IS SO ORDERED.**

**Dated this 15th day of January, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**
